David Howard Kelley v. Commissioner.
Kelley v. Commissioner
Docket No. 67775.
United States Tax Court
T.C. Memo 1960-52; 1960 Tax Ct. Memo LEXIS 236; 19 T.C.M. (CCH) 263; T.C.M. (RIA) 60052; March 25, 1960
Franklin R. Davis, Esq., 6772 Hollywood Blvd., Hollywood, Calif., for the petitioner. John Schessler, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined a deficiency in the income tax of petitioner for the year 1953 in the amount of $3,263.94. The sole issue is whether the unpaid balance of a note issued by petitioner in favor of National Associates, Inc. was forgiven in 1953 and constituted taxable income for that year. Findings of Fact Some of the facts have been stipulated and, as stipulated, they are incorporated herein by reference. Petitioner is a resident of Roanoke, Virginia. He filed a joint income tax return with his then wife, Dorothy E. Kelley, for the year 1953 with the *237 director of internal revenue at Los Angeles, California. Petitioner and Dorothy E. Kelley are now divorced. Petitioner is sometimes known as Howard Kelley. Petitioner has been engaged in the life insurance business for about 34 years. In 1948 he was appointed the general agent for Massachusetts Mutual Life Insurance Company of Springfield, Ohio, for its Chicago agency. Petitioner operated that agency until 1951, during which time its business increased from 2 1/2 million dollars to 8 1/2 million dollars. National Associates, Inc. (hereinafter referred to as National) is a California corporation having its principal place of business at Los Angeles. It was engaged in the life insurance business particularly with reference to placement of pension plans. In the early part of 1951 National, through its president Howard Neal, informed petitioner that it was interested in securing his services to manage a new insurance venture involving the sale of mortgage insurance to people buying homes through savings and loan associations. After discussion between petitioner and Neal an agreement was reached that a limited partnership would be formed to engage in this venture; that petitioner *238 would not be required to make any cash contribution to the partnership capital; and that he would be permitted to withdraw $1,250 per month from the partnership for the first two years to cover his personal living expenses. As of March 1, 1951, a limited partnership was organized under the laws of California and a "Limited Partnership Agreement" entered into between petitioner and National. The agreement, in so far as here material, provided that petitioner would be the general partner and National the limited partner; that the partnership would conduct its business under the name of "Howard Kelley and Associates"; that petitioner would contribute no capital; that National would contribute $5,000; that the profits and losses would be shared equally, except that National would be liable for losses only to the extent of its capital contribution; that National would not be personally liable for any debts of the partnership; that Kelley would be entitled to draw $1,250 per month during the first 24 months as advances against his share of the net profits; that in the event of termination or dissolution of the partnership, because of a violation by Kelley of any of the covenants contained *239 in the agreement, or at Kelley's request, and not by reason of Kelley's death, total or permanent disability, or retirement at or after his attainment of age of 60, Kelley would repay to the partnership 50 per cent of such advances in excess of his share of net profits; that Kelley's 50 per cent vested interest in the renewal commissions vested in the partnership would be applied first against such advances in excess of his share of partnership net profits; that upon dissolution of the partnership, its assets would be liquidated and proceeds applied (1) to the payment of debts and liabilities of the partnership and expenses of liquidation; (2) to the repayment of all capital contributed by the partners; and (3) the remaining surplus to be divided among partners according to their respective interests; that upon termination or dissolution, each partner would receive one-half of the insurance renewal commissions that were vested during existence of the partnership; that Kelley would devote a major portion of his time and attention to the business of the partnership; and that the partnership might be terminated by either party upon 90 days' written notice. The operations of the limited *240 partnership were successful, and on or about May 31, 1952, it was decided to dissolve and to operate the business thereafter as a division of National. The petitioner's capital account for the period of partnership operation is summarized as follows: Original capital invested
None
Share of net loss for 10 months'
period March 1 to December 31,
1951
($ 332.34)
Drawings - 10 months @ $1250 per
month
( 12,500.00)
Balance at December 31, 1951 (Defi-
cit)
($12,832.34)
Share of net profits for 5 months'
period ended May 31, 1952
5,609.78
Drawings - 5 months @ $1250 per
month
( 6,250.00)
Balance at May 31, 1952 (Deficit)
($13,472.56)
Partnership tax returns were filed for the years 1951 and 1952 on Form 1065. Petitioner reported the loss of $332.34 on his 1951 return on Form 1040, and the profit of $5,609.78 on his 1952 return. He did not report as income any portion of the $1,250 monthlys drawing made during these two years. An agreement for dissolution of the limited partnership was entered into as of May 31, 1952. The agreement, in so far as here material, provided that the partnership, and its business, be terminated at the close of business on *241 May 31, 1952, and an audit of its books be made as of that date; that any partner having a deficit in his capital account pay the amount thereof to the company so that his capital account would balance; that the assets of the partnership be transferred to National in exchange for the balance in its capital account, the cancellation of any indebtedness owing by the partnership to it, and the assumption by it of all liabilities of the partnership; that the business continue, without interruption, as a division of National; that petitioner be employed by National as a Vice President and General Manager of its Howard Kelley and Associates Division at a salary to be based on a percentage of net profits which initially was to be not less than 40 per cent of the profits earned by the Howard Kelley and Associates Division plus 10 per cent of the profits earned by National; that petitioner be permitted to acquire 12,000 shares of National at a price of $2 per share, after that corporation had increased its capital stock from $25,000 to $50,000 pursuant to permission to be obtained from the California Commissioner of Corporations; and that Kelley authorize National to use his name in the conduct *242 of its separate division under the fictitious name of Howard Kelley and Associates. Thereafter, an employment contract between petitioner and National was prepared, but was never executed. In order to complete the dissolution of the partnership and to carry out the agreements with respect thereto petitioner executed a promissory note to National for $13,472.56, the amount of the deficit in his capital account as at May 31, 1952; a certificate cancelling the limited partnership was duly filed and recorded; the partnership's fictitious name "Howard Kelley and Associates" was abandoned; a certificate that National was conducting an insurance business under the fictitious name of "Howard Kelley and Associates" was filed for the corporation; all assets of the partnership, including petitioner's share of vested renewal commissions, were transferred to National; petitioner was elected a vice president of National and general manager of National's Howard Kelley and Associates Division; National amended its articles of incorporation to increase its authorized capital stock from $25,000 to $50,000; and National applied for a permit to issue additional shares of its stock. Petitioner never *243 acquired any of the shares of National. Some time between June 1952 and January 1953, petitioner paid $4,500 to National to apply on his promissory note, thereby reducing the principal balance thereof to $8,972.56. At a meeting of the board of directors of National held on February 20, 1953, the following resolution was adopted: "WHEREAS, by mutual agreement Mr. Howard Kelley is leaving the employ of the company effective March 1, 1953, and it is desirable that the corporation and Mr. Howard Kelley enter into a suitable closing agreement so that the duties and obligations of each party may be ascertained. NOW THEREFORE, BE IT RESOLVED, that the officers of this corporation be and they are authorized to consult with Mr. Howard Kelley, and to negotiate a satisfactory settlement with him." Petitioner's employment by National was terminated on March 1, 1953. Prior to that date he sought legal counsel in order to ascertain what legal rights he had under his contracts with National, but no legal action was taken. He also communicated with the head office of Continental Assurance Co. at Chicago. At that time Howard Kelley and Associates, then operating as a division of National, *244 was the second largest agency of Continental and was writing insurance in excess of one million dollars per month. Continental was interested in retaining both the petitioner and National as general agents and sent its executive vice president, Howard Reeder, to Los Angeles to act as peace maker. Petitioner was offered a new agency of his own provided an amicable settlement could be arranged. Through the efforts of Howard Reeder, the differences between petitioner and National were settled amicably by an agreement, entered into by them as of March 1, 1953, which was denominated a "Partnership Dissolution Agreement". It provided, in part, that the limited partnership entered into as of March 1, 1951, be dissolved as of March 1, 1953; that National obtain all the assets of the partnership, except one-half of the vested renewal commissions payable to petitioner, in consideration for assuming and agreeing to pay all the debts and obligations of the partnership; that National pay petitioner $1,900 upon execution of the agreement; that National release and discharge petitioner of and from any and all indebtedness to partnership and of and from any and all demands or obligations whatsoever *245 with respect to partnership debts or affairs; that the partnership general agency contract with Continental Assurance Company be terminated; and that petitioner receive one-half of the vested renewal commissions on business written prior to March 1, 1953, as long as he was a duly licensed agent of that company in the State of California. The second "Partnership Dissolution Agreement" was prepared by the attorneys of Continental Assurance Company. At the time of its preparation the company did not know that the limited partnership between petitioner and National had been dissolved as of May 31, 1952. During the negotiations which preceded the preparation and execution of the agreement no mention was made of the existence of a promissory note for $8,972.56 by either petitioner or National. Petitioner received the $1,900 referred to in the second "dissolution" agreement and also received a membership in the Jonathan Club valued at $600. He reported both of these amounts as taxable income in his return for the year 1953. Petitioner's share of vested renewal commissions on insurance sold prior to March 1, 1953, received by him after that date, has been reported as income in his returns *246 for the years in which such income was received. Subsequent to March 1, 1953, Continental Assurance Co. appointed petitioner as its general agent for a new agency with offices on Wilshire Boulevard in Los Angeles. National continued as agent as it had theretofore, but entirely separate and apart from petitioner's agency. The promissory note given by petitioner to National at the time the limited partnership was dissolved on May 31, 1952, was not returned to him by National. Petitioner has not made any payments on this note since the second "dissolution" agreement was executed on March 1, 1953, and National has not made any attempt to collect the unpaid balance due on the note as of that date. In 1953 National charged off an amount of $10,287.39 as an expense to an account entitled "Cost of Settling Agent's Contract" and deducted the same on its 1953 corporation income tax return, Form 1120. Included in this amount was the unpaid balance of petitioner's promissory note. Petitioner's income tax return for 1953 contains the following statement regarding the note: "Taxpayer and National Associates, Inc. made a settlement, whereby taxpayer was relieved of his obligation on the note *247 and received in addition $1,900.00 in cash. * * * taxpayer does not believe that the relief of the promissory note constitutes income." In determining the deficiency for 1953, respondent included the unpaid balance of the note in the amount of $8,972.56 in petitioner's taxable income for that year. Opinion RAUM, Judge: Petitioner contends that the respondent erred in including $8,972.56, the unpaid balance of the note he gave National on May 31, 1952, in his income for the year 1953. His argument in support of this contention is, in substance, as follows: National violated the May 31, 1952, dissolution agreement by terminating his employment and by failing to complete the sale to him of 12,000 shares of its stock. By reason of this breach he had an election to institute an action for damages or to seek rescission of the agreement. He chose rescission. The fact that the March 1, 1953, agreement "sought to completely ignore the first dissolution of the partnership, clearly indicates a rescission did, in fact, take place". As a result of the rescission the note no longer existed and his liability for the unpaid balance of $8,972.56 was extinguished. The tax effect of the debit *248 balance in his capital account must be tested by the provisions of the original partnership agreement and without regard to any obligation represented by the promissory note. Inasmuch as there was no provision in that agreement requiring him to repay any advances or drawings in the event of a breach by National, he was under no obligation to repay them, and, to the extent that they created a debit balance in his capital account they represented drawings in excess of his distributive share of partnership earnings and profits. A partner is taxable only on his share of partnership earnings and profits, and not on cash drawings he is permitted to withdraw from the partnership under a partnership agreement. Drawings made by him in excess of his distributive share of partnership earnings were not, therefore, subject to taxation. We do not agree with petitioner. We are not convinced that he, after his employment by National was terminated on March 1, 1953, ever sought a rescission of the agreement of May 31, 1952, or that any action to rescind that agreement was ever taken. While it is true that the so-called "Partnership Dissolution Agreement" of March 1, 1953 ignored the fact that the *249 limited partnership had been dissolved by the agreement of May 31, 1952, and contained provisions for the dissolution of that partnership, we fail to see how this can be construed as indicating that there was a rescission of the agreement of May 31, 1952. The evidence discloses that the agreement of March 1, 1953, was prepared by attorneys for the Continental Assurance Company and that at that time this company did not know that the limited partnership between petitioner and National had been dissolved and merged into National, and that the insurance business the partnership had conducted under the fictitious name of "Howard Kelley and Associates" was being conducted under the same name by a division of National. Why Continental was not informed of the dissolution of the partnership and the operation of the business it formerly conducted as a division of National is not disclosed. We are convinced, however, that the agreement was intended to settle the affairs of the business that had been conducted under the name of "Howard Kelley and Associates" by both the partnership and National and to fix the rights and obligations of petitioner and National as of March 1, 1953, when the operation *250 of the business under the name was terminated. The provisions of the agreement must be construed in the light of this intention. Among other things the agreement provided that "National hereby releases and discharges Kelley of and from any and all indebtedness to said partnership and of and from any and all demands or obligations whatsoever with respect to said partnership, debts, or affairs." When the agreement was consummated on March 1, 1953, petitioner was indebted to National in the amount of $8,972.56 for the unpaid balance of the note given by him to National on May 31, 1952. The effect of the quoted provision was to relieve petitioner of his obligation to pay that balance and both petitioner and National treated it as having that effect. Petitioner has not paid any principal or interest on the note since March 1, 1953, although he testified that he pays all of his obligations when due, and in his income tax return for 1953 he stated that as a result of the settlement he was relieved of his obligation on the note. In 1953 National charged off the $8,972.56 as an expense to an account entitled "Cost of Settling Agent's Contract". There is no evidence that the cancellation or *251 forgiveness of the unpaid balance of petitioner's note by National was gratuitous, "a release of something to the debtor for nothing, and sufficient to make the cancellations here gifts within the statute." Helvering v. American Dental Co., 318 U.S. 322, 327. Cf. Commissioner v. Jacobson, 336 U.S. 28. It was part of the price National had to pay and did pay to settle its differences with petitioner or to be relieved of its obligations to employ petitione. Had National paid this price in cash, the amount of cash received would have been includible in petitioner's taxable income under Section 22(a), Internal Revenue Code of 1939. The fact that it was paid by cancelling or forgiving an indebtedness does not change the tax consequences. Petitioner's remaining contention is that the note "probably" still exists and is collectible. There is no merit to this contention and it conflicts with his principal contention that the note was extinguished by reason of rescission of the May 31, 1952 agreement. As already noted our conclusion is that the unpaid balance of the note was cancelled or forgiven by provisions of the agreement of March 1, 1953, and this conclusions *252 finds support in the conduct of the parties since that date. Decision will be entered for the respondent.